IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JENNIFER THOMPSON and
CHRISTOPHER DOXEY, as
Natural Parents and Next
Friends of ACD, a minor                                    PLAINTIFFS

v.                                                CAUSE NO. 1:22cv125-LG-RPM

PASS CHRISTIAN PUBLIC
SCHOOL DISTRICT; JONES
COLLEGE; JEDEDIAH "JED"
MOONEY, individually;
BRENDAN CONNOLLY,
individually; KM, a minor;
CR, a minor; LL, a minor; TC,
a minor; MM, a minor; and
JOHN OR JANE DOES 1-10                                     DEFENDANTS

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART PASS CHRISTIAN PUBLIC SCHOOL
DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

ACD filed this lawsuit by and through his parents against Pass Christian

Public School District ("PCSD") and others, alleging he was bullied and sexually

harassed by his high school soccer teammates.  PCSD seeks summary judgment as

to Plaintiffs' claims filed under Title IX and the Mississippi Tort Claims Act

("MTCA").  As detailed below, PCSD's [258] Motion for Summary Judgment is

granted as to Plaintiffs' Title IX claim and denied in all other respects.

## BACKGROUND

Some of the following allegations are disputed, but the Court must assume

they are true when considering PCSD's Motion for Summary Judgment.  During his

deposition, ACD testified that his teammates bullied him at soccer practice

beginning in the fall semester of his freshman year at Pass Christian High School

("PCHS"). For example, they rubbed Icy Hot lidocaine cream, dust, and mud on his

clothing and cleats in order to aggravate a genetic skin disease he suffers from.

They also belittled him and stole money from his gym bag on bus trips to soccer

games. One of ACD's teammates shared videos of the bullying with others. ACD

believes they bullied him because he was given more playing time than his

teammates thought he deserved. ACD reported the bullying to the head soccer

coach early in the soccer season, and the coach said that he would handle it. When

the bullying continued, ACD once again notified his coach, who responded that

there was nothing he could do. PCHS Assistant Principal Jedidiah Mooney, who is

the father of KM, also criticized ACD's soccer skills from the bleachers at games.

ACD's father testified that he reported teammates' bullying on three

occasions, and the coach agreed to increase supervision of the team and to enhance

the punishment for bullying. Shortly thereafter, ACD was removed from the soccer

team because he was sent to alternative school for bullying a special needs student.

His former teammates did not bully him during the remainder of the school year or

at soccer try-outs that spring. However, Assistant Principal Mooney taunted ACD

about his grades and prevented him from participating in a school assembly after he

returned from alternative school.

On June 16, 2021, part of the PCHS soccer team, including ACD and the

teammates who allegedly bullied him, traveled together in one of PCSD's buses to

Jones College for a soccer camp. The PCSD School Board approved the trip, and the

team's new soccer coach, Michael Archbold, accompanied the team. While at Jones College, the teammates stayed on the second floor of a dormitory made up of four-bedroom suites, while Coach Archbold and the coaches for other participating teams slept in rooms on the first floor. ACD chose his best friend, LL, as his roommate, but ACD thinks Coach Archbold assigned the other rooms in ACD's suite to teammates who had previously bullied him—KM, CR, TC, and MM. No evidence indicates that Coach Archbold was aware of the prior bullying. At the time of the camp, ACD, KM, CR, and MM were freshmen, and TC was a sophomore.

While the team was in the dormitory prior to the first practice at camp, Defendants CR, MM, and LL held ACD down while KM removed ACD's clothing. When ACD was taking a nap after the first practice, MM, LL, KM, and CR shoved a Vienna sausage in his mouth and poured water from the can on ACD's bed.

That evening, after the team played a soccer game, TC, MM, CR, and LL once again held ACD down while KM removed ACD's shorts and underwear. KM then made a FaceTime call to a minor female and showed her ACD's naked body.

After breakfast the following morning, MM, KM, CR, and LL entered ACD's room while he was changing clothes. MM and CR held ACD down while KM removed ACD's clothing. During the team's lunchbreak that day, ACD fell asleep in his room but was awakened when a teammate named Jace[1] poured a little bit of hot water and ramen noodles on him. That evening, KM, MM, CR, and TC entered ACD's room and again removed his clothing. They told him it would be the last

---

[1] Jace is not a party to this lawsuit.

time if he did not resist.

Later that evening, Jace and KM spit at ACD and a teammate named Brance. They also called ACD and Brance offensive names. All of ACD's suitemates, except for LL, then went to an upper-classman's room to use a dab pen, which is used to vaporize cannabis. When they returned to their suite, KM and CR were discussing possible pranks that they could play on the first teammate who fell asleep.

ACD tried to stay awake, but he determined it was safe to go to sleep at around midnight. He awakened when KM poured semen on ACD's face. MM videoed the incident and shared it on Snapchat. ACD did not report his teammates' mistreatment to his parents, coach, or any other adult during the camp.

The team left the camp early the following morning, which was a Friday, because a hurricane was approaching the Mississippi Gulf Coast. During the bus-ride home, KM spit on ACD, belittled him, called him an offensive name, and teased him. ACD's teammates did not bully him during the weekend following camp.

ACD told his mother about his teammates' mistreatment the following Monday, June 21st. That day, ACD's mother and father reported the incidents to PCHS Principal Boyd West, who encouraged them to file a police report. ACD and his parents met with the Jones County Police Chief on Tuesday, June 22nd in order to file criminal charges against ACD's teammates.

Soon after meeting with ACD's parents, Principal West contacted the other boys' parents and began an investigation of ACD's allegations. The boys began

-4-

sending messages about Principal West's investigation in Snapchat group chats they had formed prior to camp.

PCHS's Discipline Review Committee conducted a hearing concerning ACD's allegations on July 21, 2021. Two days later, the Committee recommended that KM and CR be placed in alternative school for 180 days[2] and that MM be placed in alternative school for 90 days. PCSD adopted those recommendations as to KM and CR. KM successfully appealed the Committee decision, and he spent 90 days in alternative school. CR chose not to appeal, and spent 90 days in alternative school due to his good behavior and good grades. PCHS reduced the Committee's recommended punishment for MM to 45 days in alternative school. He unsuccessfully appealed that decision. Meanwhile, TC received in-school suspension.

In their Amended Complaint, Plaintiffs sued PCSD, Jones College, PCHS Assistant Principal Jedidiah "Jed" Mooney, Jones College Soccer Coach Brendan Connolly, and the following minors: KM, CR, LL, TC, and MM.[3] The Court previously dismissed all of the claims pending against Connolly pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs filed a Motion to Dismiss their claims against Minor Defendant LL, which was granted by the Court. Plaintiffs filed a stipulation dismissing Assistant Principal Mooney.

---

[2] Principal West testified that 180 days is an academic year at PCHS.
[3] It appears that ACD and all of the minor defendants are now over age eighteen but under age twenty-one, which is the age of majority in Mississippi. *See* Miss. Code Ann. § 1-3-27.

Plaintiffs attempted to assert several Fourteenth Amendment claims against PCSD in addition to a civil conspiracy claim, a negligence claim pursuant to the Mississippi Tort Claims Act, a Title IX sexual harassment/discrimination claim, a Title IX retaliation claim, a negligent infliction of emotional distress claim, an intentional infliction of emotional distress claim, and an assault and battery claim. The Court granted PCSD's Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Plaintiffs' Fourteenth Amendment, assault and battery, and civil conspiracy claims pursuant to Fed. R. Civ. P. 12(b)(6). However, the Court denied PCSD's request for dismissal of Plaintiffs' Title IX claim due to allegations in the First Amended Complaint that ACD's teammates used a group chat created and monitored by PCSD to bully and harass ACD after camp.

ACD and his teammates have since admitted that no PCSD administrator, coaches, or employees participated in, monitored, or established these group chats. The messages were posted on socialia in groups informally created by students. PCSD now seeks summary judgment as to Plaintiffs' Title IX and MCTA claims.

## DISCUSSION

A motion for summary judgment may be filed by any party asserting that there is no genuine issue of material fact, and that the movant is entitled to prevail as a matter of law on any claim. Fed. R. Civ. P. 56. The movant bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant

carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Id.* at 324–25. The non-movant may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986). "Factual controversies are resolved in favor of the non-moving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## I.    PLAINTIFFS' TITLE IX CLAIMS

### A.    TITLE IX SEXUAL HARASSMENT

"Congress enacted Title IX in 1972 with two principal objectives in mind: To avoid the use of federal resources to support discriminatory practices and to provide individual citizens effective protection against those practices." *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 340 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 1002, 218 L. Ed. 2d 21 (2024) (internal citation marks and alterations omitted). The statute provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

The Supreme Court has determined that, "in certain limited circumstances," a school district's deliberate indifference to one student's sexual harassment of another student constitutes sexual discrimination in violation of Title IX. *Davis*

*Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999).

Specifically, a school district may be liable for student-on-student harassment if the

district:

> (1) had actual knowledge of the harassment, (2) the harasser was
> under the district's control, (3) the harassment was based on the
> victim's sex, (4) the harassment was so severe, pervasive, and
> objectively offensive that it effectively barred the victim's access to an
> educational opportunity or benefit, and (5) the district was deliberately
> indifferent to the harassment.

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir.

2011).  The Supreme Court has explained, "These factors combine to limit a

[school's] damages liability to circumstances wherein the [school] exercises

substantial control over both the harasser and the context in which the known

harassment occurs."  *Davis*, 526 U.S. at 645–46.  For example, when "the

misconduct occurs during school hours and on school grounds," the district "retains

substantial control over the context in which the harassment occurs," and it

"exercises significant control over the harasser."  *Id.* at 646.  The Court further

observed "that the nature of [the State's] power [over public schoolchildren] is

custodial and tutelary, permitting a degree of supervision and control that could not

be exercised over free adults."  *Id.* (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515

U.S. 646, 655 (1995)).

Nevertheless, the Court cautioned that its ruling "does not mean that

recipients can avoid liability only by purging their schools of actionable peer

harassment or that administrators must engage in particular disciplinary action."

*Davis*, 526 U.S. at 648.  Courts must consider the "surrounding circumstances,

expectations, and relationships . . . including, but not limited to, the ages of the harasser and the victim and the number of individuals involved . . . ." *Id.* at 651. Since "students are still learning how to interact appropriately with their peers," courts must distinguish "insults, banter, teasing, shoving, pushing, and gender-specific conduct" that amounts to "simple acts of teasing and name-calling" from "behavior [that] is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Id.* at 651–52. "Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment." *Id.* at 653.[4]

Bullying motivated by rivalry, personal animus, or social status is not the type of conduct prohibited by Title IX, even if it is "tinged with offensive sexual connotations." *Sanches*, 647 F.3d at 165. For example, the First Circuit has found that bullying was not based on sex where the plaintiff's classmates pulled his pants down on multiple occasions, sometimes in front of girls, because the circumstances revealed that the bullying was likely rooted in retaliation. *Morgan v. Town of Lexington, MA*, 823 F.3d 737, 745 (1st Cir. 2016). Meanwhile, the Fifth Circuit, has held that evidence of "numerous acts of offensive touching," including the removal of the victim's underwear without consent, could satisfy the based-on-sex element of a Title IX claim at the pleadings stage. *Carmichael v. Galbraith*, 574 F. App'x 286,

---

[4] While Plaintiffs allege that Assistant Principal Mooney mistreated ACD during his freshman year, they have not alleged that his actions were based on ACD's sex. ACD's father testified that Plaintiffs did not have contact with Assistant Principal Mooney after the Jones Camp because ACD transferred to a different school. As a result, Assistant Principal Mooney's actions do not support a Title IX claim.

l290 (5th Cir. 2014).  In particular, "[c]ourts have . . . struggled with cases similar to the present one, where hazing occurs in a sports or team setting.  In such situations, it is not always obvious whether alleged hazing was motivated by the victim's sex." *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F. Supp. 3d 543, 559 (E.D. Tenn. 2018).

Deliberate indifference is the pivotal factor in the present case.  Therefore, the Court finds it unnecessary to address whether the incidents at Jones Camp were based on ACD's sex or whether the incidents were sufficiently severe, pervasive, and objectively offensive to support a Title IX claim.  As for the actual knowledge factor, there is no evidence or testimony supporting a finding that ACD was subjected to sexual harassment before the Jones Camp.  Furthermore, the parties do not dispute that PCSD's employees and administrators first learned of the events at camp after the students had returned.  Therefore, when considering Plaintiffs' Title IX claim the Court is limited to the PCSD's actions after the camp. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) ("[T]he express remedial scheme under Title IX is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation.").

The Fifth Circuit has held that establishing deliberate indifference is "a high bar." *Roe*, 53 F.4th at 341.  Proof that the school was negligent is insufficient; rather, the district's response to harassment must be "clearly unreasonable in light of the known circumstances." *Id.*

Plaintiffs primarily argue that PCSD was deliberately indifferent because it failed to comply with its own Title IX policies.  However, the Supreme Court has

rejected this argument, holding that a school district's failure to comply with its own policies "does not establish the requisite . . . deliberate indifference" to support a Title IX claim. *See Gebser*, 524 U.S. at 291–92. (Defendant's alleged failure to comply with Title IX regulations does not establish the requisite actual notice and deliberate indifference to constitute discrimination under Title IX); *Sanches*, 647 F.3d at 169 ("A district's failure to comply with its regulations does not establish the requisite deliberate indifference."); *see also K.S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 787 (5th Cir. 2017) ("Even if the [School] District failed to follow guidelines from the Office for Civil Rights or even its own policies, deliberate indifference is not thereby shown.").

The record reflects that PCSD promptly investigated. Principal West began contacting and interviewing ACD's teammates no more than three days after learning of ACD's allegations. Principal West testified that he interviewed LL, MM, CR, and TC, and he obtained an emailed statement from KM. Principal West interviewed some of the students more than once because their account of the incidents changed. His investigation included consideration of the social media posts made by the boys after camp.[5]

Following the investigation, PCHS conducted disciplinary hearings, and PCSD disciplined KM, CR, TC, and MM for their mistreatment of ACD. While Plaintiffs believe that the discipline was insufficient, "[s]chools need not accede to a

---

[5] In the Court's opinion, only one of the posts—a photograph with a caption that MM admitted he posted to make fun of ACD—made references that could reasonably be viewed as related to sex.

parent's remedial demands or actually succeed in remedying the harassment." *See Roe*, 53 F.4th at 341. Furthermore, courts are required to "afford broad deference to school officials and should not second-guess the disciplinary decisions made by school administrators." *Id.*

Plaintiffs next argue that PCSD "took no action to protect ACD once it became aware of the sexual harassment identified and reported by its [p]rincipal" and that PCSD did not offer ACD "any supportive services." Pls.' Mem. [297] at 37. But, the soccer camp was held during early summer, while school was out of session. ACD never returned to PCHS as a student[6] after the soccer camp. He was a student at Gulfport High School in the Gulfport School District when Principal West concluded his investigation.[7] It is unclear what "protection" or "support services" Plaintiffs claim that PCSD should have provided to ACD while he was a student in another school district.

This is not a case in which a school district ignored a student's allegations of sexual harassment; rather, PCSD investigated ACD's allegations and punished the students who were involved. Therefore, PCSD did not respond to ACD's allegations with deliberate indifference. *See Davis*, 526 U.S. at 649 (holding that a school district "must merely respond to known peer harassment in a manner that is not clearly unreasonable"); *see also I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360,

---

[6] As explained in more detail below, ACD voluntarily returned to the PCHS campus for athletic events while he was a student at other schools.

[7] ACD attended Gulfport High School his sophomore year and Saint Stanislaus Catholic High School his junior year and senior year.

369 (5th Cir. 2019) ("[N]egligent delays, botched investigations of complaints due to the ineptitude of investigators, or responses that most reasonable persons could have improved upon do not equate to deliberate indifference."). PCSD is entitled to partial summary judgment as to Plaintiffs' Title IX sexual harassment claim.

### B.    TITLE IX RETALIATION

Plaintiffs next argue that ACD was subjected to Title IX retaliation after PCSD's investigation concluded.  To establish Title IX retaliation, a plaintiff must demonstrate that the school district or its representatives took an adverse action against him because he complained of harassment.  *Sanches*, 647 F.3d at 170–71 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005)).

A student must demonstrate deliberate indifference on the part of the school district unless the retaliation claim involves the school district's official policy. *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 (5th Cir. 2020).  Plaintiffs have not alleged that any PCSD policy caused ACD to suffer an adverse action.  Rather, they claim ACD experienced retaliation from other students and from PCHS's athletic director.  As a result, Plaintiffs are once again required to establish deliberate indifference on the part of PCSD.

First, Plaintiffs argue that PCSD retaliated against ACD by allowing two of his former teammates to compete against him in a cross country meet while they were supposed to be in alternative school.  This incident does not qualify as an adverse action because Plaintiffs have not alleged that ACD's former teammates mistreated him at the meet or that ACD was unable to fully participate in the meet.

-13-

Plaintiffs next claim that KM wore a Jones College shirt to a soccer game against ACD's new team during the summer of 2022, and KM and other PCHS players called ACD names throughout the game. However, PCSD testified at its 30(b)(6) deposition that it was not aware of this allegation. Plaintiffs further assert that KM broke into ACD's truck and stole his wallet at an off-campus Halloween party, and, on another occasion, KM forced ACD's truck off the road after he happened to see him driving in Pass Christian. These were off-campus events over which PCSD had no control or involvement, and there is no evidence that Plaintiffs reported the incident to PCSD.

ACD next alleges that the student section at his soccer games called him offensive names related to what happened to him at camp. He testified that these students attended various schools on the Mississippi Gulf Coast and a school that is three hours away. ACD's mother testified that she also heard students taunting ACD from the stands during his soccer games. During her deposition, she never specified whether she was referring to events at PCHS or at other schools. Her testimony, that she reported the behavior to someone is equally vague. The Court cannot discern deliberate indifference on the part of PCSD on this basis.

Plaintiffs also categorize the following events as retaliation:

On one occasion, ACD was standing on the visitor's sideline during a game between PCHS and Bay High, accompanying his father who was Bay High's soccer coach. PCHS [Athletic Director] Ricky Smith walked across the field to the visitor sideline and told ACD he was not allowed to be there with his father. . . . In yet another incident, ACD was on the field for a St. Stanislaus (SSC) v. PCHS football game, because he was an [assistant] trainer for the team. During halftime, when the SSC team went to the locker room, ACD headed for the locker room to make

-14-

> sure they had the Pedialyte/electrolyte drinks they needed. However,
> PCHS [Athletic Director] Smith approached ACD, and told him he was
> not allowed to go to the locker room.  Instead, ACD was forced to sit on
> the SSC sideline during halftime, with the news reporter.

Pls.' Mem. [297] at 46–47.  There is no evidence that these actions were reported to

PCSD administrators or that either incident was retaliation for ACD's Title IX

claim, particularly since ACD conceded that he was prevented from going to the

locker room because he was not wearing the correct clothing or credentials.  PCSD

30(b)(6) designee, Dr. Robyn Killebrew, testified that she was only aware of one

incident concerning ACD, where he was prevented from going to the home side of

the field at a PCHS football game pursuant to a PCSD policy that applies to all

students from the visiting school.

   Finally, Plaintiffs note that KM pushed or punched ACD from behind at the

end of a soccer game between PCHS and St. Stanislaus.  Plaintiffs concede that KM

received a red card for this incident, so the Mississippi High School Activities

Association required KM to miss two games.  PCHS's soccer coach prohibited KM

from playing in a third game as additional punishment.  PCSD and Saint

Stanislaus also agreed that their high school boys' soccer teams would not oppose

each other in future games until ACD had graduated.  Plaintiffs claim KM's three-

game suspension was insufficient,[8] and that the decision to no longer play Saint

---

[8] ACD was also assessed a red card at that game.  He admits that he taunted the
PCHS team and student section with a gesture after he scored the winning goal,
and KM struck him from behind soon afterwards.  Nevertheless, the Court has
assumed for purposes of the pending Motion that KM's subsequent attack was
retaliation for ACD's sexual harassment claim.

Stanislaus denied "ACD the opportunity to enjoy a complete final season playing his favorite sport." Pls.' Mem. [297] at 41.

ACD was not a PCSD student at the time of these alleged retaliatory events; thus, PCSD's control over the circumstances was limited. *See Davis*, 526 U.S. at 645–46 (explaining that a school district's damages liability is limited to circumstances where the district "exercises substantial control over both the harasser and the context in which the known harassment occurs"). For example, it is unclear whether PCSD knew that ACD would be attending any of these events so that it could attempt to prevent any harassment or bullying of ACD.

Furthermore, deliberate indifference is a high standard that cannot be satisfied where district officials were unaware of the incidents or had no control over the actors. For incidents that a district is aware of, it must merely refrain from acting in a manner that is "clearly unreasonable in light of the known circumstances." *See Davis*, 526 U.S. at 648. PCSD disciplined KM for his conduct toward ACD on the soccer field and attempted to prevent ACD and KM from playing each other in future games. The Court is not free to second-guess these decisions. Plaintiffs appear to believe that nothing short of expulsion would have been the appropriate response to ACD's allegations against KM. Although Plaintiffs' stance is understandable, it has been squarely rejected by the United States Supreme Court. *See id.* The Court finds that PCSD is entitled to summary

judgment as to Plaintiffs' Title IX retaliation claim.[9]

## II.    PLAINTIFFS' MTCA CLAIMS

### A.    SUPPLEMENTAL JURISDICTION

Plaintiffs filed this lawsuit in federal court on the basis of federal question jurisdiction. The Court has now dismissed all of Plaintiffs' federal claims. The Court does not have original jurisdiction over Plaintiffs' remaining state law claims because the parties are not of diverse citizenship.

When a court dismisses all federal claims, "the court generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state law claims." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). However, a district court may decline to exercise supplemental jurisdiction over these claims if "it has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed," *Heggemeier v. Caldwell County, Texas*, 826 F.3d 861, 872 (5th Cir. 2016), and "[t]he general rule is that a court should decline to exercise jurisdiction" in this circumstance, *Brookshire Bros. Holding v. Dayco Prod., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009). However, "this rule is neither mandatory nor absolute." *Id.* Although none of the parties have argued that this Court should

---

[9] To the extent that Plaintiffs may be arguing that the events that occurred after he left PCHS constituted additional sexual harassment, their claim would be subjected to the same deliberate indifference standard, with the same result of summary judgment in favor of PCSD. *See Davis*, 526 U.S. at 648.

decline to exercise supplemental jurisdiction, the Court finds that it should conduct this analysis out of respect for comity due to the complicated nature of the state law issues that remain pending.

A district court's decision whether to exercise supplemental jurisdiction depends upon the "common law factors of judicial economy, convenience, fairness, and comity." *Id.* (quotation omitted).  The judicial economy factor asks whether the district court has "substantial familiarity or [is] intimately familiar" with the remaining state law claims. *Enochs v. Lampasas County*, 641 F.3d 155, 159–60 (5th Cir. 2011).  It also contemplates whether dismissal would require the parties to duplicate "research, discovery, briefing, hearings, or other trial preparation work." *Id.* at 159.  The convenience factor concerns whether the state court would be closer to where "the parties, witnesses, and evidence [are] located." *Id.* at 160. Meanwhile, the fairness factor considers the prejudice to the parties that would arise from dismissal," such as concern that a party "would be prejudiced by having to start over in state court." *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 588 (5th Cir. 1992), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003)).  Finally, the comity factor demands that the "important interests of federalism" be respected by federal courts, which are courts of limited jurisdiction and "not as well equipped for determinations of state law as are state courts." *Enochs*, 641 F.3d at 160.

The Court first considers the judicial economy and fairness factors.  This lawsuit has proceeded in federal court for two years and six months.  The parties

have completed discovery and filed numerous motions. The pretrial conference is just one month away. The Fifth Circuit has indicated that declining to exercise supplemental jurisdiction in this circumstance may be an abuse of discretion. *See Brookshire Bros. Holding*, 554 F.3d at 602 ("Our case law is clear that when a district court . . . remands a suit after investing a significant amount of judicial resources in the litigation analogous to that invested by the district court in this case, that court has abused its discretion under 28 U.S.C. § 1367.").

The remaining factors of convenience and comity would not overcome the prejudice and loss of resources that would occur if the Court dismissed the case at this late stage. Therefore, the Court will exercise supplemental jurisdiction over Plaintiffs' state law claims.

### B. PLAINTIFFS' NEGLIGENCE CLAIM

PCSD argues it is entitled to summary judgment as to Plaintiffs' negligence claim because the events that occurred at the soccer camp were not foreseeable. To prove negligent supervision, "a plaintiff must establish by a preponderance of the evidence the existence of a duty of care, a breach of that duty, proximate causation, and compensable damages." *Stephens v. Miller*, 970 So. 2d 225, 227 (Miss. Ct. App. 2007).

"The MTCA provides the exclusive civil remedy against a governmental entity for acts or omissions which give rise to a suit." *J.D. v. McComb Sch. Dist.*, 347 So. 3d 199, 203 (Miss. Ct. App. 2022). The MTCA generally waives sovereign immunity for claims based on torts committed by governmental entities and their

-19-

employees, but it retains immunity for claims described in Miss. Code Ann. § 11-46-9(1), which provides in part:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim . . .
> (b) Arising out of any act or omission of an employee of a governmental entity exercising ordinary care in reliance upon, or in the execution or performance of, or in the failure to execute or perform, a statute, ordinance or regulation, whether or not the statute, ordinance or regulation be valid . . . .

Miss. Code Ann. § 11-46-9(1)(b).  The duties referred to in this subsection are ministerial duties that have been "positively designated by statute, ordinance, or regulation."  *Smith ex rel. Smith v. Leake Cnty. Sch. Dist.*, 195 So. 3d 771, 777 (Miss. 2016).

Under Mississippi law, superintendents, principals, and teachers in public schools have a duty to:

> observe and enforce the statutes, rules and regulations prescribed for the operation of schools.  Such superintendents, principals and teachers shall hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess.

Miss. Code Ann. § 37-9-69; *Chaffee v. Jackson Pub. Sch. Dist.*, 270 So. 3d 905, 907 (Miss. 2019).  School districts also have a ministerial duty to prevent bullying "on school property, at any school-sponsored function, or on a school bus."  *Smith*, 195 So. 3d at 779; Miss. Code Ann. § 37-11-67(1).  When determining if a school district can be held liable for a ministerial duty claim, the pertinent question is whether the school failed to use ordinary care to prevent foreseeable injury.  *T.K. ex rel. D.K. v. Simpson Cnty. Sch. Dist.*, 846 So. 2d 312, 317  (Miss. Ct. App. 2003).

While PCSD claims it did not know that ACD's teammates had bullied him prior to camp, it concedes that the Court must view the record in the light most favorable to Plaintiffs when considering PCSD's Motion for Summary Judgment. It explains:

> Assuming arguendo, that notice was given to PCSD of the incidents that occurred during the fall semester of 2020 involving ACD and his teammates, it simply was not foreseeable to the School District that the incident(s) at the soccer camp would occur six months later, especially since ACD testified that there were no incidents with his teammates during the spring semester of 2021, and there were no incidents with his teammates during the spring soccer try-outs.

PCSD's Mem. [259] at 15. PCSD notes that ACD testified he was excited to go to camp, and he did not think any of the bullying from the fall semester would continue. PCSD also notes that ACD's parents did not express any concerns about bullying to ACD's new coach.

The Mississippi Supreme Court thoroughly analyzed the requirement of foreseeability in *City of Jackson v. Est. of Stewart ex rel. Womack*, 908 So. 2d 703, 712 (Miss. 2005). In *Stewart*, the Court explained:

> Foreseeability, as respects liability of the negligent person, does not include events which are bizarre or so unique as to be without the contemplation of one reasonably prudent. A person charged with negligence in that he should have anticipated the probability of injury from an act done by him is not bound to a prevision or anticipation which would include an unusual, improbable or extraordinary occurrence, although such happening is within range of possibilities.

*Id.* at 712 (internal alterations and quotation marks omitted). Furthermore, "[a] defendant is obligated solely to safeguard against reasonable probabilities and is not charged with foreseeing all occurrences, even though such occurrences are

within the range of possibility." *Stewart*, 908 So. 2d at 712 (quoting *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 175 (Miss. 1999)).

Meanwhile, in *Summers v. St. Andrew's Episcopal Sch., Inc.*, 759 So. 2d 1203 (Miss. 2000), the Court addressed foreseeability in the context of school supervision. The *Summers* case concerned the alleged molestation of a kindergarten student named Nikki by her classmates while teachers conversed in another area of the playground. *Id.* at 1206. Nikki testified that she had previously told her teacher that one of her classmates had kicked her. *Id.* She also claimed that she had been scratched in the face with a pinecone and spit on prior to the molestation on the playground. *Id.* at 1213. In subsequent decisions, the Supreme Court and Court of Appeals have emphasized the following three facts concerning supervision in the *Summers* case—"the teachers assigned to playground duty were (1) away from the immediate area, (2) located where they could not observe the children and (3) unaware that the incident had occurred." *Chaffee*, 270 So. 3d at 909 (quoting *Slade v. New Horizon Ministries, Inc.*, 785 So. 2d 1077, 1079 (Miss. Ct. App. 2001)).

PCSD argues that the *Summers* decision is distinguishable because the assault in that case occurred on a playground, while the alleged incidents in the present case occurred in a dormitory where students were changing clothes, showering, and sleeping. The Court recognizes that, "[a]bsent special, dangerous circumstances, a school district does not have the duty of providing constant supervision of all movements of pupils at all times." *See Chaffee*, 270 So. 3d at 909. And "[t]he school is not an insurer of the safety of pupils[ ] but has the duty of

exercising ordinary care, of reasonable prudence, or of acting as a reasonable person would act under similar circumstances." *Summers*, 759 So. 2d at 1213.

For this reason, the Mississippi Court of Appeals recently held that a coach did not have a duty to supervise his students "in the locker room while they were changing into their basketball practice attire." *Aldridge v. S. Tippah Cnty. Sch. Dist.*, No. 2023-CA-00418-COA, 2024 WL 3870492, at *4 (Miss. Ct. App. Aug. 20, 2024). The Court of Appeals has also recognized that a teacher's duty may differ in "a non-traditional show choir class" where "it was ordinary and reasonable behavior for students to be on their phones, standing, and dancing (or jumping)." *Bumpous v. Tishomingo Cnty. Sch. Dist.*, 391 So. 3d 257, 263 (Miss. Ct. App. 2023).

Importantly, the students in the incidents at issue in *Aldridge* and *Bumpous* were friends with no known animosity before the injuries occurred, making the harmful incidents completely unexpected. Meanwhile, ACD has testified that PCSD was aware of the prior bullying he experienced. In addition, while *Aldridge* and *Bumpous* pertained to a single, sudden incident, ACD claims that he was assaulted, harassed, or bullied on multiple occasions, including repeated incidents in which he was held down and stripped naked at camp.[10] During these alleged incidents, it is unclear where Coach Archbold was located since he did not see or hear what the students were doing. ACD's teammates testified that they did not

---

[10] While ACD's testimony regarding the number of assaults and whether PCSD had notice of prior bullying is disputed, his testimony prevents the Court from awarding summary judgment.

know where Coach Archbold's dormitory room was located, and some of them mistakenly believed their coach was staying in another dormitory building.

Coach Archbold was not required to supervise his soccer team during private moments like sleeping and showering, but the testimony of ACD and his teammates indicates they may have been completely unsupervised during their free time. Deposition testimony also reveals that the teammates did not stay behind closed doors during their free time, but they moved from room to room and between different floors. They described incidents that occurred in the common areas of the dormitory, including an episode in which part of the team left in an attempt to locate and fight another team. On another occasion, KM and Jace stood on the second-floor balcony and spit at ACD and Brance and called them names while ACD and Brance were sitting in the common area near their coach's dorm room. However, Coach Archbold was unaware that this incident had occurred. Finally, some of ACD's teammates testified that the incidents would not have occurred if their coach had watched them more closely.

The Court finds there is a genuine issue of material fact as to whether the alleged mistreatment of ACD was "reasonably foreseeable and preventable by taking of reasonable precautions." *See Chaffee*, 270 So. 3d at 909. Furthermore, the Mississippi Supreme Court has indicated that the age of the children at issue and the length of time they are left unsupervised must be weighed in order to determine "what constitutes proper and adequate supervision." *Todd v. First Baptist Church of W. Point*, 993 So. 2d 827, 830 (Miss. 2008). Given the disputed facts presented,

this determination cannot be made on summary judgment. Instead, the finder of fact weigh the evidence and render a judgment according to the facts and law.

Finally, the *Summers* decision demonstrates that the element of foreseeability does not require that the prior mistreatment alleged by a plaintiff be similar in kind or severity to provide a school with notice that more supervision may be needed. *See Summers*, 759 So. 2d at 1214. Thus, the Court finds that a fact question exists concerning whether the alleged incidents at camp were foreseeable due to the prior bullying alleged by ACD. PCSD's request for summary judgment on Plaintiffs' MTCA negligence claim is denied.

### C.    ACD'S PARENTS' EMOTIONAL DISTRESS CLAIMS

ACD's parents have clarified that they are not seeking bystander emotional distress damages. Therefore, it is not necessary to address PCSD's request for summary judgment regarding emotional distress experienced by ACD's parents.

### D.    ACD'S EMOTIONAL DISTRESS CLAIMS

PCSD has not provided any argument in support of its request for summary judgment as to ACD's emotional distress claims. Therefore, PCSD's Motion is denied as to those claims.

### E.    PLAINTIFFS' DEMAND FOR ECONOMIC DAMAGES

Plaintiffs have produced medical bills for three visits at Thrive Counseling, PLLC, in an attempt to recover economic damages. PCSD argues that the medical bills are inadmissible because Plaintiffs have not presented expert testimony that the bills were related to the incident at issue. The Mississippi Court of Appeals has

rejected this argument.  *City of Jackson v. Graham*, 226 So. 3d 608, 613 (Miss. Ct. App. 2017).  "Proof that medical, hospital, and doctor bills were paid or incurred because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or incurred were necessary and reasonable."  *Id.* (quoting *Boggs v. Hawks*, 772 So. 2d 1082, 1085 (Miss. Ct. App. 2000); *see also* Miss. Code Ann. § 41-9-119).  Furthermore, as this Court has previously explained:

> To prevail on claims for emotional distress, there must be a specific discernable injury to the claimant's emotional state, proven with evidence regarding the nature and extent of the harm.  The plaintiff's own testimony, standing alone, may be sufficient to prove mental damages but only if the testimony is particularized and extensive enough to meet the specificity requirement discussed above.

*Smith v. Koch Foods, Inc.*, No. 3:19-CV-721-DPJ-FKB, 2022 WL 17084137, at *10 (S.D. Miss. Nov. 18, 2022) (internal citations and quotation marks omitted).  Therefore, ACD can testify that he sought counseling due to emotional distress he experienced after the alleged mistreatment by his teammates, and he can also present the medical bills related to that treatment at trial.  PCSD's Motion is not well-taken to this extent.

## CONCLUSION

For the foregoing reasons, the Court finds that PCSD is entitled to summary judgment as to Plaintiffs' Title IX claims.  However, PCSD's request for summary judgment as to Plaintiffs' MCTA negligence claim, ACD's emotional distress claims, and Plaintiffs' demand for economic damages is denied.  As noted above, there are genuine issues of material fact that preclude summary judgment.  Instead, the finder of fact should weigh the evidence and render a judgment according to the

facts and law.

To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Pass Christian Public School District's [258] Motion for Summary Judgment is **GRANTED** as to Plaintiffs' Title IX claim and **DENIED** in all other respects.

**SO ORDERED AND ADJUDGED** this the 30th day of November, 2024.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE